**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**-------------------------------------------------------------------x**
**ALIYAH SILVER,**

**Case No. 1:25-cv-04375**

**Plaintiff,**

**-against-**

**TOP LINE REPORTING INC. and**
**TRANS UNION, LLC.,**
**Defendants.**
**-------------------------------------------------------------------x**

*ORAL ARGUMENT REQUESTED*

**PLAINITFF'S MEMORANDUM OF LAW IN OPPOSITION TO TOP LINE REPORTING INC'S MOTION TO DISMISS/JUDGMENT ON THE PLEADINGS**

## I. INTRODUCTION

In May 2024, Aliyah Silver was confronted with an all-too-common problem for New York City tenants – her apartment had become infested with rodents. She could have exercised her right to vacate her apartment due to her landlord's violation of the implied warranty of habitability and simply ceased paying rent. Instead, concerned in large part about keeping up a good credit history, Ms. Silver chose a different path. **She decided to make sure she paid every dollar of rent owing under her lease agreement until her landlord was able to re-rent her apartment to a new tenant.** Her reward for this conduct? Her landlord decided to destroy her credit anyway.

This lawsuit results from her failed attempts to remove the inaccurate reporting from her credit report. Accordingly, Defendant Top Line Reporting, Inc's ("Top Line") Motion to Dismiss/Judgment on the Pleadings should fail for one simple reason: **Plaintiff paid all amounts owed to her landlord after she vacated her apartment** and thus never should have been reported

as delinquent on her credit reports.

## II. FACTUAL BACKGROUND[1]

Plaintiff was forced to vacate her apartment in May 2024 after it became infested with rodents and uninhabitable. Plaintiff promptly informed her landlord ("Bruckner") that she was vacating the apartment since it was no longer habitable. Before the Plaintiff left the leased premises in May of 2024, she paid the rent due for that month to Bruckner and communicated to the latter to use her security deposit to cover the rent for the month of June, and that she agreed to pay the rent as well for the month of July if no one else would move in by that time. After learning that a new tenant had moved in halfway through July, Plaintiff paid for her portion of July and assumed the matter was done.

Instead, Bruckner informed the Plaintiff that she owed them $6,437 for a "concession charge." Plaintiff's lease made no mention of a "concession charge" and there was no legal basis whatsoever to seek those amounts from Plaintiff. In fact, Bruckner sent Plaintiff an e-mail on July 31, 2024 stating that she owed $2,857 and made no mention of any $6,437 concession charge.

Defendant Top Line thereafter began reporting that Plaintiff owed $3,820 and that she was 60 days late on that payment to Trans Union – an amount that does not appear anywhere on the Plaintiff's rent ledger. Plaintiff mailed a detailed written dispute with supporting documentation to Defendant Trans Union on December 5, 2024. Plaintiff's dispute letter explained that Plaintiff had paid rent in full for May 2024, that Buckner had applied her security deposit to cover June 2024 rent, and that she had paid her part of July rent until her apartment had been re-rented.

[1] All facts are cited directly from Plaintiff's First Amended Complaint ("FAC").

Plaintiff's dispute letter also referenced and attached the ledger from Defendant Top Line which sated that she owed $10,307 on July 3, 2024. At no point on that ledger did it ever state that Plaintiff owed $3,820 on her apartment.[2] Plaintiff also attached a copy of her lease agreement with Bruckner. The lease made no mention whatsoever of a concession charge or that Plaintiff would owe payment for a concession charge if she terminated the lease early for any reason. Top Line refused to conduct an actual investigation of Plaintiff's dispute. The Top Line tradeline on Plaintiff's credit report was self-contradictory. The account says it was 60 days past due in December 2024, yet in the monthly payment rating on the tradeline state that Top Line did not know if Plaintiff made payments in July through November 2024.

## III. LEGAL ARGUMENT

Top Line's motion fails because it rests on a false premise: that Plaintiff's FCRA claim depends on resolving unsettled legal questions between Plaintiff and her former landlord. It does not. Plaintiff alleges that Top Line reported a specific balance and delinquency that are contradicted by Top Line's own records and cannot be reconciled with any payment history. That allegation, taken as true, states a claim under § 1681s-2(b).

### A. PLAINTIFF ALLEGES AN OBJECTIVELY AND READILY VERIFIIABLE INACCURACY

First, to be crystal clear, Plaintiff does not allege a breach of the implied warranty of habitability as a defense to any rents owing on her lease. While Plaintiff had every right to rely upon that defense to vacate her apartment and cease paying rent – she did not take that approach. **Instead, she made sure that her landlord received every dollar it was owed in rent until the apartment**

[2] This fact alone supports Plaintiff's argument that the information reported by Top Line was not accurate.

**was re-rented to a new tenant**. As detailed in Plaintiff's FAC, she vacated her apartment due to a rodent infestation in May 2024. She paid May rent in full on May 1, 2024, as evidenced on the subject Rent Ledger (see Mallon Declaration, Exhibit A). She instructed her landlord to apply her security deposit to cover June rent – *which it did.* (See Rent Ledger credit of $2,575 for Security Deposit on June 19, 2024). Thus, Top Line's argument that Bruckner was not obligated to apply Plaintiff's security deposit to June's rent is moot because Bruckner chose to apply the security deposit to cover June 2024 rent. Plaintiff confirmed via public records that her apartment was rented to a new tenant on July 15, 2024, and Plaintiff thereafter made payment to Bruckner for her portion of July rent ($1,162,90) on August 27, 2024.[3] **Accordingly Plaintiff paid every dollar owed under her lease agreement until a new tenant moved into her old apartment.**

B. <u>TOP LINE HAS NOT SHOWN ANY LEGAL BASIS FOR A CONCESSION CHARGE</u>

Thus, the only amounts owing according to Bruckner's Rent Ledger were from a $6,437.50 "Concession Charge" Bruckner added to Plaintiff's Rent Ledger on May 20, 2024. *Neither Bruckner nor Top Line has ever made any attempt, before or after the instant litigation, to explain why Plaintiff owed this charge after she moved out of her apartment.* Plaintiff's lease agreement with Bruckner made no reference to owing a "concession charge" (or any other charge) should she move out prior to the end of her lease agreement.

C. TOP LINE'S RELIANCE UPON AN ALLEGED CONCESSION CHARGE DOES NOT <u>TRANSFORM THIS DISPTUE INTO A COMPLEX LEGAL QUESTION</u>

Top Line argues that determining whether or not Plaintiff owed this amount to Bruckner would require it to determine if an implied contract existed between Plaintiff and Bruckner for repayment

[3] While this payment is not reflected on the subject Rent Ledger because the ledger ends on July 31, 2024.

of the concession charge, and such an analysis is not required under the Fair Credit Reporting Act. Top Line is wrong for several reasons.

First, this is not a complicated legal dispute like was present in *Mader v. Experian Information Solutions, Inc.,* 56. 4th 264 (2nd Cir 2023). Either the lease stated Plaintiff would owe a concession charge if she vacated the premises early or it did not**. It undisputedly did not.** That is no more complicated that the "balloon payment" involved in the lease agreement in *Sessa v. Trans Union, LLC* 74 F.4th 38, 41 (2nd Cir. 2023), where the Second Circuit found that "the District Court erred by ending its analysis after it found that the accuracy of the reported balloon payment amount to a legal dispute, and was therefore not actionable under 1681e(b)." As the Second Circuit explained in *Mader*, even CRA's "may be required by the FCRA to accurately report information derived from readily verifiable and straightforward application of law to facts." *Id.* at 270.

Top Line's argument that a Court would have to determine if an implied contract existed allowing Bruckner to collect a concession charge is at best a red herring. First, this is a Motion for Judgment on the Pleadings, and there is zero evidence in front of the Court for the basis of the concession charge to begin with. Moreover, any furnisher in any case could simply avoid liability for any FCRA claim by arguing that there was an "implied contract" to allow them to charge a consumer whatever fee they wish to impose without introducing a scintilla of evidence that such an obligation ever existed in the first place. Top Line cites no authority in support of its novel argument because none exists.

D. TOP LINE'S MINIMAL VERIFICATION FAILS AS A MATTER OF LAW AT THE PLEADINGS STAGE

Here, we know that Top Line never even asked Bruckner about the disputed concession charge

in its "investigation" of Plaintiff's dispute. In response to an Order from the Court, Top Line produced an email chain to Bruckner regarding Plaintiff's dispute. See ECF # 25, Mallon Declaration Exhibit B. [Plaintiff requests that the Court take Judicial Notice of the entry.] In fact, it appears that Top Lines entire investigation into Plaintiff's dispute consisted of sending an email to Bruckner stating the following: "Tenant has filed a dispute – Disputes present/previous Account Status/Payment Rating/Account History. Please provide a copy of a recent ledger."

E. AS A FURNISHER WITH DIRECT ACCESS TO THE UNDERLYING ACCOUNT INFORMATION, TOP LINE HAD A HEIGHTENED OBLIGATION TO CONDUCT A MEANINGFUL INVESTIGATION UNDER 1681s-2(b)

Furthermore, Top Line relies solely upon cases against consumer reporting agencies ("CRA's") and then simply *assumes* that the investigation standards for furnishers' such as Top Line should be the same as those applied to CRA's. However, a furnisher's obligations to investigate consumer disputes under the FCRA is not even in the same section as a CRA's responsibilities, and the FCRA does not use the same language for those disputes. Furnishers are required to "investigate" consumer disputes received from CRA's pursuant to 1681s-2(b), while CRA's are required to "reinvestigate" pursuant to 15 USC 1681i and to use "reasonable procedures to ensure maximum possible accuracy" under 15 USC 1681e(b). Courts have recognized that a furnisher is often in a far better position than a CRA to conduct a meaningful investigation because it is the original source of the information reported. It is the furnisher that is reporting the existence of the debt, while the CRA merely relays that data to interested parties. Thus, the furnisher has first-hand information related to the debt that the CRA could not possibly have.

Top Line did not argue in its motion that as a debt-collector furnisher it should be held to a lower standard because it was collecting the debt on behalf of Bruckner and should not be allowed

to raise the argument for the first time on reply. Even if it had, however, the argument lacks merit because Top Line was still a "furnisher" under the FCRA and was obligated to report accurate information the same as a first party furnisher is. If the Court were to find a reduced investigative burden for third party furnishers than every creditor would be incentivized to hire a third party to reports its debt to CRA's instead of doing so itself.

While the Second Circuit does not appear to have addressed this issue squarely, other Circuit Courts have held that indeed furnishers should be held to a higher standard than CRA's under the FCRA:

> Although FCRA requires both agencies and furnishers to conduct "reasonable" investigations, a furnisher's investigatory obligations will often be more extensive and more thorough. Credit reporting agencies are third parties that "lack[] any direct relationship with the consumer," so they must rely on the representations of the furnishers who usually own the debt. *Gorman,* 584 F.3d at 1156-57; *see Caravalho, 629. F.3d at 891* (agencies "simply collect and report information furnished by others."). Furnishers, on the other hand, "stand[] in a far better position to make a thorough investigation of a disputed debt ..." *Gorman,* 584 F.3d at 1156. This means that FCRA will sometimes require furnishers to investigate, and even to highlight or resolve, questions of legal significance. As the Consumer Financial Protection Bureau emphasized in its amicus brief, FCRA does not categorically exempt legal issues from the investigations that furnishers must conduct. The distinction between "legal" and "factual" issues is ambiguous, potentially unworkable, and could invite furnishers to "evade their investigation obligation by construing the relevant dispute as a `legal' one."

*Gross v. CitiMortgage, Inc.,* 33 4th 1246, 153 (9th Cir 2022).

F. THE COURT'S PRIOR DISMISSAL OF THE CLAIMS AGAINST TRANS UNION DOES NOT CONTROL PLAINTIFF'S FURNISHER CLAIM

Accordingly, this distinction between furnishers and CRA's means that it would not be inconstant to deny Top Lines motion for judgment on the pleadings after granting Trans

Union's motion to dismiss in this action.[4] The Court's prior ruling turned on what would be unreasonable to expect of a CRA — not a furnisher with direct access to the landlord and ledger.

## IV. CONCLUSION

The CRA's arguments in Mader and Sessa were essentially that it would be unfair for them to be asked to determine what a consumer owed a particular furnisher. That reasoning is simply not present when the dispute is directed towards the party actually reporting allegedly inaccurate information. Plaintiff has adequately alleged that she paid all amounts owing under her lease agreement and that Top Line refused to adequately investigate her claim. No more is required at the pleadings stage and Top Line's motion must be dismissed accordingly.

Dated: January 12, 2026

Respectfully submitted,

Kevin C. Mallon
238 Merritt Drive
Oradell, NJ. 07649
(646) 713-1008
kmallon@consumerprotectionfirm.com
*Attorneys for the Plaintiff Aliyah Silver*

[4] Moreover, there was a factual error in the Court's Order granting Trans Union's Motion to Dismiss. That Order stated that Plaintiff "offered only her word in support" of the fact that she paid rent for May, June and part of July 2024. That was not correct, as Plaintiffs' dispute letter included Bruckner's rent ledger which showed payments received and credited for May and June 2024.