# Exhibit H

this is dated July 3rd, 2024, and this is referring to an outstanding balance of 10,307.90, for the same apartment, Apartment 2F. Did you also receive this letter?
A. Yes.
Q. Okay.
A. It was another auto, auto message.
Q. Got it. Okay. And these two letters, would you agree, they're both from 101 Bruckner?
A. Yes.
Q. Okay. So, at this time, were there any letters from Top Line Reporting to you?
A. No.
Q. Okay. On July 31st, 2024, Joseph Kline, from -- actually, let me ask you: Who is Joseph Kline?
A. I believe he's -- he maybe owns or is the manager of 101 Bruckner. He was like the point of contact from the very beginning for me.
Q. Okay. So, he works for 101 Bruckner?
A. I believe so.
Q. Okay. And was 101 Bruckner the management company for the building you resided in?
A. I think it's called like -- no. It's JCS Realty. What's in the e-mail there.
Q. Okay. So, did Joseph Kline work for JCS Realty?

A. No. They just tried --
MR. MALLON: Objection. Form. You can answer.
THE WITNESS: No. They just reported it on my credit that I owed "3,820.60, which is obviously different than all three of these balances. And it was also reported on the same day that management e-mailed me claiming I only owed 2,000 something dollars, which I also didn't owe.
BY MS. SABHARWAL (resuming):
Q. I understand. Did you get any letters from Top Line Reporting similar to the letter we discussed you received about your balance on 7-3-2024 and on 6-4-2024 demanding payment for your rent balance?
A. I never received an auto message from Top Line. I just received that they reported on my credit that I owed $3,820.60. 60 days late.
Q. Okay. I want to go through some e-mails you had with Top Line where you're discussing what you just described, which was the amount that they reported on your credit. Let's pull that up. I'm sorry. Just bear with me. I'm getting an error message. Can you see my screen?
A. Yep.
Q. Okay. Perfect. So, I want to go through these e-mails. I'm going to find the first e-mail between you

Q. Okay. So, these e-mails that we went through with Top Line, they're about what Top Line reported on your credit, correct?

A. Correct.

Q. Okay. So, you're not discussing the rent balance with Top Line here; is that fair to say?

MR. MALLON: Objection. Form. Misstates her testimony.

BY MS. SABHARWAL (resuming):

Q. Okay. Well, I'll rephrase the question: Were you discussing your rent balance or what your landlord claimed was owed with Top Line Realty (sic)?

A. I can't possibly discuss how it is false without discussing why it's false. And it has to do with rent, so it's a very extensive e-mail that discusses rent, of course, about why the information is false and why I don't owe them that money.

Q. Okay. Sure. But when you're discussing rent, you're discussing rent in the context of what was reported by Top Line Realty (sic)?

A. I think I'm very confused by your question.

Q. Okay. When you were communicating with Top Line, was it your understanding that they reported something on your credit?

A. They did, yes.

Q. Did Top Line ever call you demanding payment for a debt?
A. No. And I should say to the e-mail, to the mail that you -- the question about the mail, they didn't have my address anyway, and neither does 101 Bruckner, so if they did send something, I'm not -- I would have never received it. It would have been --
Q. Top Line doesn't have your address?
A. Correct.
Q. Okay. Did Top Line -- well, my next question was going to be: Did Top Line ever send you a collection letter?
MR. MALLON: Objection. Form.
BY MS. SABHARWAL (resuming):
Q. Did Top Line ever send you a collection letter?
MR. MALLON: Same objection.
THE WITNESS: I wouldn't know. Certainly, not to my current address and they don't have my address.
BY MS. SABHARWAL (resuming):
Q. Okay. Did you ever have a rental agreement with Top Line Reporting?
A. No.
Q. Did you ever sign a lease with Top Line Reporting?

A. No.
Q. Was Top Line Reporting ever your landlord?
A. No.
Q. Was the only party that attempted to collect the amount that they owed, that they claimed that you owed on your rent, JCS Realty or 101 Bruckner?
MR. MALLON: Objection. Form.
THE WITNESS: They're the only ones that e-mailed me that I had all those balances.
BY MS. SABHARWAL (resuming):
Q. Were there other forms of communication that were used, aside from e-mail, to collect the rent balance?
A. I would -- I mean, I would argue that the report on my credit that I owed $3,800, 60 days late, from Top Line is me saying that I'm 60 days late from a payment that I need to make, but they never sent me a bill for, to my knowledge, for 3,800.
Q. Okay. So, I just want to repeat my question. I'm specifically talking about the debt you -- or JCS Realty claimed you owed: Aside from them contacting you by e-mail, did they use any other means to collect the amount that they claimed that you owed?
A. I guess what I'm saying to you is, I think a means is them having Top Line report on my credit that I

owe that money, but if you disagree with that, I think maybe that's what your clarification was from.

Q. Did -- I'm not trying to trick you.

A. Oh, I know.

Q. Did Top Line ever send you an e-mail or send you any kind of communication indicating that you owed money?

A. No. They never sent me an e-mail saying that I owed money.

Q. Did they ever call you saying that you owed them money?

A. Nope. The only e-mail that they sent about the balance was what you showed in your exhibits, with them saying that they confirmed with management that I owed a balance or whatever that e-mail said.

Q. Okay. And your communications with Top Line concerned what they reported?

A. Correct.

Q. Your communications with Top Line did not concern what JCS Realty claimed that you owed on the account?

A. Well, that's incorrect, because the reason why they're reporting something is because of what JCS claimed I owed, so they're the same thing.

Q. How about --

you've asked me this question several times, and I told you that I've never received a bill from Top Line.

MR. MALLON: Aliyah, she's asking -- I think she's asking a little different question here. Do you want to ask it -- just listen. Do you want to ask it again, Bhavleen?

BY MS. SABHARWAL (resuming):

Q. I'm specifically talking about the e-mail communications that you had with Top Line. I understand that you just testified that a rent balance was discussed, but my question was: Did Top Line ever ask you to pay that rent balance or did they ever ask -- or did they ever demand payment for that rent balance?

A. Yeah. I told you they never demanded payment from me. They never sent me a bill. To my knowledge, I never got something to my address, right.

Q. Okay. So, the extent of your discussions with Top Line, if there were any discussions regarding the rent balance, involved what they had reported on your credit. Do I understand that correctly?

A. Correct. That was to dispute --

MR. MALLON: Objection. Form. You can answer.

THE WITNESS: -- information that they put on my credit.

MS. SABHARWAL: I'm sorry. I didn't hear the

that 3,820 amount on your credit report?

A. I'm not sure. I think Kevin would know.

MR. MALLON: Just answer what you know.

THE WITNESS: I don't -- I'm not sure. I don't -- if I look on my bank apps, my credit score is back to exceptional, so I would think that maybe it's frozen or maybe it came off entirely. I'm not sure.

BY MS. SABHARWAL (resuming):

Q. I'm going to represent to you that the tradeline was deleted from your credit report as of July of 2024.

A. Okay.

MR. MALLON: Objection. It's obviously not true.

MS. SABHARWAL: Okay. So, what's the date?

MR. MALLON: I'm not doing your job for you, but I promise you it wasn't deleted in July, 2024.

MS. SABHARWAL: Okay. Thank you. Is that a speaking objection? I don't think so.

MR. MALLON: Please don't make false statements to my witness and we won't have a problem.

MS. SABHARWAL: Okay. Well, you can pull up the credit report and see for yourself.

THE WITNESS: I -- I received --

emotional distress? I just don't understand what economic damages mean legally.

Q. Did you -- did your finances suffer at all because of the reporting on this case?

A. I would say the credit, being denied the credit, was harmful to me.

Q. Can you explain how?

A. Yeah. I think that the Apple cash benefits and the Apple cash-back benefits on the Apple Card was something I was really looking forward to. It's not an option that I have on my current credit card so I obviously didn't get those.

I think I got trapped into, also, a higher lease here, paying a lot of money, a fear that I can't get another apartment with that on my credit.

Q. For how many months was your credit affected as a result of the reporting?

A. I couldn't possibly tell you that. I don't know when it -- I mean, it was at least July, August, September, October, November, January, February, March, April, at least nine months, if I got denied in April. But I can't possibly tell you how much longer it was on there, if you're saying that it's off now.

Q. And what year was your credit affected or years?

A. 2024, 2025. We're in 2026 now. I'm not sure. You're saying it's removed so --

Q. You testified that you were -- you didn't apply for any other credit cards, aside from the Goldman Sachs card during that time?

A. Correct.

Q. Were you denied any apartments that you applied for because of your credit?

A. I didn't even apply. I went out last year to look for apartments so I could reduce my current rent, and they told me that they were going to check the credit so I didn't even bother because I was lucky enough to get into this apartment before the TransUnion or before Top Line reported to TransUnion the false amount.

Q. Okay. Aside from being denied the Goldman Sachs Card, how else has your credit been affected as a result of the reporting?

A. How else has my credit been affected?

Q. Yes.

A. Well, I went from exceptional credit, perfect credit, to a 600-something score, which is extremely embarrassing and humiliating. I've had perfect credit and/or rental history for the last ten years, and it's something I take seriously and work hard to have.

I'm not sure how else my credit could be

impacted beyond dropping from exceptional to 600-something, the low 600s, unless I'm misunderstanding your question.

Q. So, how did you not having what you claim to be exceptional credit translate to -- you're seeking economic damages in this case, so were there any economic damages that resulted from your denial of credit, aside from being denied the Goldman Sachs Card?

MR. MALLON: Objection. Form. Go ahead. You can answer.

THE WITNESS: Yeah. I think that's the missed cash-back opportunities. I just told you that I don't get that on my credit, my current credit card. That's the --

BY MS. SABHARWAL (resuming):

Q. I'm sorry. I'm going to have to slow you down because I'm writing this down. How much in missed cash opportunities resulted?

A. Well, I could tell you how much money I spend on my other credit cards at a later time since, you know, whatever the date was that this happened and then probably --

Q. Well, I'm just talking about the Goldman Sachs Card. How much in cash rewards do you believe you missed, if you know?

A. Well, that's what I'm saying. I'd have to go back and calculate what I had to put on my other card, where I don't get cash back from, in order to give you that number.

Q. Were there any other rewards or benefits that you missed because you were denied the Goldman Sachs credit card?

A. Just their tiered cash back, that's the main benefit of the Apple, right, besides the integration with all my other Apple products and devices, right. It's the tiered cash-back benefit and the Apple cash.

Q. What is the tiered cash-back benefit?

A. They have a 3, 2, 1 percent cash-back benefit. Three percent on certain merchants, some of which I use; two percent on everything else, as long as you're using Apple Pay, and one percent on everything else. Right now I get zero percent cash back on my purchases.

Q. And what credit card are you using right now?

A. An Amex.

Q. Is your credit still being -- strike that.

You testified that your credit was excellent earlier, right?

A. Yep.

Q. Okay. So, why are you only at zero percent for Amex?

days, probably more than they care to hear about, since then.

Q. And when did you get the notification?

A. August 3rd.

Q. Of what year?

A. 2024.

Q. And when was the last time you spoke to them about the reporting?

A. Like I said, probably two days ago, whenever -- yesterday. Two days ago. I talk to them every other day. Every day. It's something that's going on in my life right now, so they're going to hear about it.

Q. What specifically did you talk to them about?

A. The harm that this has caused me, the stress that I'm going through, the prolonged stress having to dispute false information against my credit, against me at this point --

Q. But you received --

A. -- the Apple Card.

Q. You testified before the break that you now had excellent credit, correct?

A. I can see excellent credit on my Capital One App, however they're collecting that information. I can see that there's not an impact on my score. I don't know if that's going to come off permanently. I don't know if