**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

-----------------------------------X

ALIYAH SILVER,

        Plaintiff,

    v.                            Case No. 25-CV-04375 (BMC)

TOP LINE REPORTING INC. and
TRANS UNION, LLC,

        Defendants.

-----------------------------------X

**PLAINTIFF'S RESPONSE TO DEFENDANT TOP LINE REPORTING INC.'S**
**LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS**
**AND COUNTER-STATEMENT OF ADDITIONAL MATERIAL FACTS IN DISPUTE**

Pursuant to Local Civil Rule 56.1(b) and (c) of the United States District Courts for the Southern and Eastern Districts of New York, Plaintiff Aliyah Silver respectfully submits the following response to Defendant Top Line Reporting Inc.'s Local Rule 56.1 Statement of Undisputed Material Facts ("Def. 56.1"), together with a counter-statement of additional material facts that are in genuine dispute and that preclude entry of summary judgment.

Citations herein to *"Goldring Dep."* are to the certified deposition transcript of Tzvi (a/k/a Henry) Goldring, taken February 11, 2026, attached to the accompanying Declaration of Kevin C. Mallon ("Mallon Decl.") as Exhibit A. Citations to *"Silver Dep."* are to the certified deposition transcript of Plaintiff Aliyah Silver, taken February 11, 2026, attached to the Mallon Declaration as Exhibit B. Citations to *"Goldring Decl."* are to the May 11, 2026 Declaration of Henry Goldring (ECF No. 56-3). Citations to "Compl." are to the Amended Complaint (ECF No. 9).

1

## I.   RESPONSES TO DEFENDANT'S STATEMENT OF "UNDISPUTED MATERIAL FACTS"

Plaintiff responds to the correspondingly numbered paragraphs of Def. 56.1 as follows. Paragraphs reciting Plaintiff's pleadings are not statements of material fact within the meaning of Local Civil Rule 56.1(a); Plaintiff responds to them solely to the extent necessary to correct any mischaracterization. *See* Local Civil Rule 56.1(d) (statements of "material fact" must be supported by record evidence).

**A. Pleadings**

1.   Plaintiff Aliyah Silver filed an Amended Complaint ("Complaint") on August 27, 2025. (Compl., Dkt. 9).

   **Response:** Admitted that Plaintiff filed an Amended Complaint on August 27, 2025.

2.   Top Line filed its Answer to the Third Cause of Action (FDCPA claim) on December 12, 2025. (Dkt. No. 31).

   **Response:** Admitted that Top Line filed an Answer on December 12, 2025.

3.   Plaintiff's claims against Trans Union under the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq., and the New York Fair Credit Reporting Act ("FCRA"), N.Y. G.B.L. § 380 et seq., were dismissed pursuant to a Memorandum Decision and Order on Trans Union's Rule 12(b)(6) motion to dismiss, entered October 16, 2025. (Dkt No. 21).

   **Response:** Admitted that Plaintiff's FCRA and N.Y. GBL § 380 claims against Trans Union were dismissed by Memorandum Decision and Order dated October 16, 2025.

2

4. Plaintiff's claim against Top Line under the FCRA, 15 U.S.C. § 1681s-2(b), was dismissed pursuant to a Memorandum Decision and Order on Top Line's Rule 12(c) motion for judgment on the pleadings, entered January 28, 2026. (Dkt No. 44). The claim against Top Line under the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 et seq., is the sole remaining claim in this action.

   **Response:** Admitted that this Court dismissed the FCRA claim against Top Line on its Rule 12(c) motion and that the FDCPA claim is the sole remaining cause of action.

5. Plaintiff alleges that 101 Bruckner "presumably retained Defendant Top Line Reporting in an attempt to collect a debt it alleged Plaintiff owed on her apartment." (Compl. ¶ 19.)

   **Response:** Not a statement of material fact. Plaintiff respectfully refers the Court to paragraph 19 of the Amended Complaint for its contents.

6. Plaintiff alleges that Top Line "qualifies as a 'debt collector' within the meaning of 15 U.S.C. § 1692(a)(6)." (Compl. ¶ 11).

   **Response:** Not a statement of material fact; the Amended Complaint speaks for itself. To the extent the paragraph is offered as a factual assertion, Plaintiff submits that Top Line is a "debt collector" within the meaning of 15 U.S.C. § 1692a(6), for the reasons set forth in Plaintiff's opposition memorandum and in the Counter-Statement below.

7. Plaintiff alleges that Top Line violated the Fair Debt Collection Practices Act ("FDCPA") by: (i) communicating false credit information to TransUnion regarding the subject disputed debt, in violation of 15 U.S.C. § 1692e(8); (ii) using false representations and deceptive means to collect the subject disputed debt, in violation of 15 U.S.C. § 1692e(10);

3

and (iii) attempting to collect a debt that Plaintiff did not owe, in violation of 15 U.S.C. § 1692f(1). (Compl. ¶¶ 58–61).

**Response:** Not a statement of material fact. Plaintiff respectfully refers the Court to paragraphs 58–61 of the Amended Complaint for the precise statutory bases of her claims.

8.    Plaintiff alleges that she "had never received a bill from Top Line, stating or itemizing the charges that were being collected from her". Instead, Top Line merely reported [emphasis added] that Plaintiff owed $3,820 and that she was 60 days late on that payment to Trans Union (Compl. ¶ 20).

**Response:** Not a statement of material fact; the paragraph is a partial recitation of the Amended Complaint. To the extent it is offered as an admission, disputed as misleading. The cited allegation does not concede that Top Line was not engaged in debt collection; rather, it alleges the means by which Top Line attempted to coerce payment from Plaintiff, namely, by reporting a false delinquent balance of $3,820 (60 days late) to TransUnion. See Compl. ¶¶ 19–20; Silver Dep. 34:24–35:1 ("I think a means is them having Top Line report on my credit that I owe that money"). See also 15 U.S.C. § 1692e(8) (prohibiting communication of credit information "known or which should be known to be false").

9.    The Complaint contains no factual allegations describing any specific conduct by Top Line directed at Plaintiff to demand, solicit, or collect a debt — including calls, letters, invoices, or other communications.

4

**Response:** Disputed. The Amended Complaint alleges, and the record establishes, specific conduct by Top Line directed at Plaintiff: Top Line communicated to TransUnion that Plaintiff owed a $3,820 delinquent rent balance and was 60 days late on that payment, knowing or having reason to know that representation was false. Section 1692e(8) of the FDCPA expressly defines such communications as "conduct" within the statute's reach. See 15 U.S.C. § 1692e(8). Top Line also corresponded with Plaintiff regarding the reported balance. See ECF No. 56-9 (Ex. E to Def.'s motion, correspondence between Plaintiff and Top Line).

10.   The Complaint's assertion that Top Line qualifies as a "debt collector" within the meaning of 15 U.S.C. § 1692(a)(6) is stated as a legal conclusion. (Compl. ¶¶ 11, 19, 58.)

**Response:** Disputed as a legal conclusion masquerading as fact. Whether Top Line is a "debt collector" is the central legal question on this motion, see 15 U.S.C. § 1692a(6), and is not a "material fact" within the meaning of Local Civil Rule 56.1(a). The Amended Complaint alleges facts establishing debt-collector status. Compl. ¶¶ 8–11, 19–20, 58. Those allegations were adequately pleaded, as the Court held when it denied Top Line's Rule 12(c) motion to dismiss the FDCPA claim. ECF No. 44.

**B. Relationship Between the Parties**

11.   Plaintiff entered into a lease agreement with 101 Bruckner Realty LLC ("101 Bruckner") to rent Apartment 2F at 101 Bruckner Boulevard, Bronx, New York 10454. (Compl. ¶ 12 and lease agreement as Ex. A).

**Response:** Admitted that Plaintiff entered into a lease with 101 Bruckner Realty LLC for Apartment 2F at 101 Bruckner Boulevard, Bronx, New York 10454.

5

12.     101 Bruckner's property management company is JCS Realty Group. Top Line's client relationship with respect to Plaintiff's tenancy was with JCS Realty Group, the property management company for 101 Bruckner. (Goldring Dep. 21:3–6; Goldring Decl. ¶ 6).

Response: Admitted only that Top Line interfaced with JCS Realty Group with respect to Plaintiff's tenancy. Disputed to the extent the paragraph implies that the absence of a direct contract with the landlord-entity 101 Bruckner Realty LLC is material. The Goldring deposition testimony cited (21:3–6) does not establish that the property management company, rather than the landlord, was Top Line's real customer; on the contrary, Top Line's own enrollment materials and the data furnishing arrangement repeatedly refer to "property owners". See Goldring Dep. 10:4–6 (Top Line is a "credit reporting data furnisher on behalf of property operators, owners, and management companies").

13.     Top Line contracted with 101 Bruckner's property management company to report rental payment data to consumer reporting agencies on behalf of the landlord. Top Line's compensation under that arrangement was a flat monthly fee per lease reported, regardless of whether tenants were current or delinquent on their rent. (Goldring Decl. ¶¶ 3–4).

Response: Disputed in part. Admitted that Top Line bills landlord clients on a monthly basis tied to the number of leases reported. Disputed as incomplete and misleading insofar as the paragraph implies that the flat-fee structure forecloses debt-collector status. Mr. Goldring testified that adverse credit reporting helps landlords collect on rent, that he pitches landlords on that benefit, and that landlords routinely strike "pay-for-deletion" bargains in which Top Line removes its negative tradelines once the consumer pays. Goldring Dep. 17:1–18, 19:3–20:19, 32:3–33:5. The cited Goldring Declaration

<div style="margin-left:70%; border:1px solid; padding:4px">
Deleted: 7

Deleted: 21:11

Deleted: 3

Deleted: 4
</div>

6

paragraphs are inadmissible to the extent they contradict Mr. Goldring's prior sworn deposition testimony on these points.

14.    Plaintiff did not have a rental agreement with Top Line (Silver Dep. 33:21–23); never signed a lease with Top Line (Silver Dep. 33:24–34:1), and Top Line was never her landlord. (Silver Dep. 34:2–3).

**Response:** Admitted that Plaintiff did not have a written rental agreement with Top Line and that Top Line was not her landlord. Disputed as immaterial. The FDCPA does not require contractual privity between the consumer and the debt collector — to the contrary, § 1692a(6) expressly reaches the "regular" collection of debts "owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6) (emphasis added).

15.    Plaintiff's communications with Top Line concerned what Top Line had reported on her credit, not collection of a rent balance. (Silver Dep. 27:2–7; 35:17–18).

**Response:** Disputed. The cited testimony does not support the paragraph. Plaintiff testified that her communications with Top Line concerned "why the information is false and why I don't owe them that money," Silver Dep. 27:13–17, and that the credit-reporting itself was "a means" of collecting the alleged debt. Silver Dep. 34:24–35:1 ("I guess what I'm saying to you is, I think a means is them having Top Line report on my credit that I owe that money."). See also Silver Dep. 35:22–24 ("the reason why they're reporting something is because of what JCS claimed I owed, so they're the same thing").

16.    Top Line and TransUnion operated under the Data Furnishers Reporting Agreement effective February 18, 2022 (the "Furnishing Agreement" as Ex. B), under which Top Line furnished rental payment data to TransUnion as a data furnisher. The Furnishing

7

Agreement identifies Top Line's purpose as follows: Top Line "desires to furnish information about consumers to TransUnion for inclusion into TransUnion's consumer reporting database(s) consistent with the furnisher responsibilities set forth in Section 623 of the FCRA." (Furnishing Agreement, § 1(C)).

**Response:** Admitted that Top Line and Trans Union had a Reporting Agreement. Disputed on the additional ground that the partial quotation in the paragraph is not the full agreement, and selective extraction does not establish anything about Top Line's "principal purpose" as a matter of law.

17.    The contractual relationship between Top Line and JCS Realty Group (the "Landlord") was established through The Rent Tracker Services Agreement dated July 26, 2022 (the "Rent Tracker Agreement"), entered into between The Rent Tracker, LLC ("TRT") and JCS Realty LLC. (Ex. C). The Rent Tracker, LLC is the exclusive sales company for Top Line Reporting Inc. and serves as the sole point of contact between Top Line and its landlord and property management clients. All client-facing sales and contracting with landlords and property management companies are conducted through The Rent Tracker, LLC on Top Line's behalf. As a result, the Rent Tracker Agreement is executed in TRT's name rather than Top Line's name, though it governs the credit reporting services provided by Top Line.

**Response:** Disputed on the grounds that the introduction of an undisclosed intermediary entity ("The Rent Tracker, LLC") does not appear anywhere in Mr. Goldring's February 11, 2026 deposition. To the contrary, Mr. Goldring testified that Top Line has "an agreement" directly with "the property management company" in this case, Goldring Dep. 21:4–6, and made no reference to The Rent Tracker, LLC. The eleventh-hour

**Deleted:** 5

8

interposition of "TRT" — disclosed for the first time in the May 11, 2026 motion papers — raises a triable issue as to corporate structure and was not the subject of any discovery.

18.    Under the Rent Tracker Agreement, the scope of services is defined exclusively as "tenant credit reporting of Client's tenants payment history" — specifically "monthly credit reporting for current payment history" to TransUnion and Equifax Client's tenants payment history" (Rent Tracker Services Agreement § 1.1).

**Response:** Disputed as immaterial.

19.    The Rent Tracker Agreement provides for a flat fee per month for credit reporting services. TRT's compensation under the agreement is fixed and does not vary based on whether any tenant pays an outstanding balance. (Rent Tracker Services Agreement, Section 2.1 Rate Schedule).

**Response:** Disputed because, even crediting the description of the fee structure, a flat fee per lease is not dispositive of "principal purpose" or "regularly collects" status under § 1692a(6).

20.    Top Line does not collect debts on behalf of the landlord. Top Line's sole business is to function as a credit reporting data furnisher on behalf of property operators, owners, and management companies by reporting rental payment data to consumer reporting agencies (Goldring Dep. 10:4–12).

**Response:** Disputed as argumentative and as a legal conclusion. Whether Top Line "collects debts" within the meaning of § 1692a(6) is the legal question on this motion. The cited deposition page (10:4–12) does not state that Top Line does not collect debts; Mr. Goldring there described Top Line's self-perception as a "data furnisher." Goldring

9

Dep. 10:4–6. Mr. Goldring also testified, inter alia, that adverse credit reporting helps landlords collect on past-due rent (Goldring Dep. 21:5–11), that he tells landlords as much during sales (Goldring Dep. 18:9–17, 20:9–11), and that landlord clients routinely engage in "pay for deletion" using Top Line's tradelines as leverage (Goldring Dep. 32:3–33:5).

| | Deleted: 19 |
|---|---|
| | Deleted: 10 |
| | Deleted: 20 |
| | Deleted: 1 |
| | Deleted: 33 |
| | Deleted: 34 |

21. Top Line does not collect any money for the landlord. (Goldring Decl. ¶ 11; Goldring Dep. 62:15–19).

Response: Disputed as argumentative. The cited deposition page (62:15–19) recites Mr. Goldring's own legal opinion that Top Line is not subject to the FDCPA, which is not evidence of any operative fact. See Fed. R. Evid. 701. Disputed in substance for the reasons set forth in Plaintiff's response to Paragraph 20.

22. Top Line's compensation is not contingent on whether any debt is ultimately paid or on how much, if any, of the debt is paid by the tenant. (Goldring Decl. ¶ 4; Goldring Dep. 21:24–22:7).

Response: Disputed as immaterial.

23. Rather, Top Line is paid a single monthly subscription fee by the landlord based on the number of occupied leases being reported per month. This fee is the same regardless of whether any given tenant pays rent on time or is delinquent. Top Line receives no bonuses or additional compensation of any kind based on whether tenants pay their outstanding balances. (Goldring Decl. ¶ 4; Goldring Dep. 22:1–7.)

Response: Disputed. The factual premise that Top Line earns a flat per-lease fee is admitted only as to gross billing structure. Disputed as to the implication that Top Line is

10

therefore not in the debt-collection business: Mr. Goldring testified that one of Top Line's express selling points is that adverse reporting motivates tenants to cure arrears and helps landlords collect, see Goldring Dep. 17:1–18, 18:6, 20:11, that Top Line's landlord clients regularly use Top Line's tradelines as leverage in "pay for deletion" negotiations, id. 32:3–33:5, and that the volume of such activity is substantial (approximately 60,000–75,000 tradelines reported each month, id. 36:18–23). The retention and renewal of Top Line's monthly subscription revenue is, on the record, dependent on the value of that collection leverage to landlords.

**C. Top Line's Relationship with Plaintiff**

24.    Plaintiff did not have a rental agreement, lease, or any other contract with Top Line (Silver Dep. 33:21–34:3).

**Response:** Admitted that Plaintiff did not have a written rental agreement with Top Line. The fact is immaterial; see Plaintiff's response to Paragraph 14.

25.    Top Line was not Plaintiff's landlord for her apartment (Silver Dep. 33:21–34:3).

**Response:** Admitted. The fact is immaterial; see Plaintiff's response to Paragraph 14.

26.    After engaging in communications with JCS Realty regarding her rent balance, Plaintiff learned of Top Line's reporting when she reviewed her credit report and saw a tradeline reported by Top Line (Silver Dep. 22:10-16).

**Response:** Admitted that Plaintiff learned of Top Line's reporting when she reviewed her credit report.

11

Deleted: 19

Deleted: 7

Deleted: 21

Deleted: 33

Deleted: 34

27. Plaintiff never received a bill from Top Line, stating or itemizing the charges that were being collected from her. (Compl. ¶ 20).

**Response:** To the extent it is offered as proof of the absence of debt-collection activity, disputed. Section 1692e(8) makes the communication of false credit information — not the sending of a "bill" — a violation.

28. Top Line never called Plaintiff demanding payment for a debt. (Silver Dep. 33:1–3).

**Response:** Admitted that no Top Line representative telephoned Plaintiff. Disputed as immaterial. Direct dunning calls are not an element of an FDCPA claim under § 1692e(8) or § 1692f(1).

29. Top Line never sent Plaintiff an email or any other communication indicating that she owed money. (Silver Dep. 35:5–9).

**Response:** Disputed. The cited testimony (Silver Dep. 35:5–9) addresses an e-mail "indicating that you owed money" — not the broader category of communications. Top Line did correspond with Plaintiff regarding the reported balance and her dispute. See ECF No. 56-9 (Ex. E to Def.'s motion). Disputed further as immaterial.

30. Top Line never demanded payment from Plaintiff (Silver Dep. 38:14–16).

**Response:** Disputed. The cited testimony (Silver Dep. 38:14–16) is that Top Line never asked Plaintiff to pay the rent balance in those words. Plaintiff explained in the same answer, and elsewhere, that Top Line's reporting of a false delinquency itself functioned as a demand. Silver Dep. 34:14–18, 34:24–35:1, 35:22–24. Disputed as immaterial; an

explicit "payment demand" is not an element of an FDCPA claim under § 1692e(8) or § 1692f(1).

31.    All written payment demands Plaintiff received came exclusively from 101 Bruckner Realty LLC and JCS Realty Group. (Silver Dep. 13:7–9; 34:4–9; correspondence with property management as Ex. D).

**Response:** Disputed as immaterial.

32.    The only communications between Plaintiff and Top Line concerned Plaintiff's dispute of the tradeline Top Line had reported on her credit.

**Response:** Disputed. See responses to Paragraphs 26, 29, and 30. The fact of dispute about the credit reporting does not establish that the credit reporting was not itself a collection effort.

33.    Plaintiff confirmed that her communications to Top Line were about disputing the information reported to TransUnion, not about collection of any rent balance. (Silver Dep. 27:2–7; 35:17–18; correspondence with Top Line as Ex. E)

**Response:** Disputed. See responses to Paragraphs 26, 29, 30, and 32. Plaintiff testified at her deposition that she communicated with Top Line precisely because she had no other recourse against the false reporting and could not, in her words, "discuss how it is false without discussing why it's false," and that "the reason why they're reporting something is because of what JCS claimed I owed, so they're the same thing." Silver Dep. 27:13–17, 35:22–24.

**D. Damages**

34.     Plaintiff claims $10,000 in economic damages. (Ex. F; Pl.'s Resp. to Top Line's Interrogatories, No. 8).

   **Response:** Admitted that Plaintiff has identified approximately $10,000 in economic damages in interrogatory responses.

35.     As of the February 11, 2026 deposition, Plaintiff's credit score had returned to "excellent" on the banking apps including Capital One app (Silver Dep. 41:5–8; 57:21–23).

   **Response:** Admitted that Plaintiff's credit returned to excellent after the Top Line tradeline was removed.

36.     The January 5, 2026 TransUnion credit report contains no Top Line tradeline and reflects only satisfactory accounts — American Express, Bank of America, and two Capital One accounts (Ex. G).

   **Response:** Admitted that the January 5, 2026 credit report contains only satisfactory accounts and does not contain the Top Line tradeline.

## II.     PLAINTIFF'S COUNTER-STATEMENT OF ADDITIONAL MATERIAL FACTS IN DISPUTE

   Pursuant to Local Civil Rule 56.1(b), Plaintiff submits the following additional material facts, each supported by record evidence, as to which there exists a genuine dispute for trial:

### A. Top Line's Sales Pitch Is That Reporting Coerces Payment

37.     When Top Line solicits landlord clients, its sales pitch includes that adverse credit reporting motivates tenants to pay overdue rent because "people don't want their credit being harmed negatively." Goldring Dep. 18:10–19:2.

Deleted: 19

Deleted: 20

Deleted: 1

14

38. Adverse credit reporting by Top Line "is going to help the landlords collect on rent on a timely basis," and that is "one of the pitches that you make to landlords." Goldring Dep. 20:5-11.

39. Top Line told its landlord clients that adverse credit reporting "is going to help us collect on past rents because people don't want their credit getting messed up." Goldring Dep. 20:12–19.

40. The function Top Line performs for landlords is the same function that "helps car companies and mortgage companies and credit card companies collect their debts." Goldring Dep. 20:17–19.

**B. Top Line's Landlord Clients Use Top Line's Tradelines as Leverage for "Pay for Deletion"—with Top Line's Knowledge and Cooperation**

41. "Pay for deletion" — the practice in which a landlord tells a consumer that, in exchange for paying an alleged balance, the landlord will "instruct Top Line to cease reporting" the negative tradeline — happens "very often" among Top Line's landlord clients and "specifically on . . . delinquent accounts." Goldring Dep. 32:3–33:8.

42. In substance, Top Line's landlord clients tell delinquent tenants: "Thanks to our good friends at Top Line Reporting; however, if you pay us the money, we'll do you a favor, and we'll instruct Top Line to cease reporting this." Goldring Dep. 32:23–33:3.

**C. Top Line Has No FDCPA Policies and Procedures and Did Not Investigate the Underlying Balance**

43. Top Line has no policies or procedures for compliance with the FDCPA. Goldring Dep. 63:1–4.

44. Before reporting Plaintiff's account as delinquent, Top Line did not ask the landlord about the "concession charge" that appears on Plaintiff's rent ledger; in Top Line's view, the

15

**Deleted:** helps

**Deleted:** 25–21:11

**Deleted:** 21

**Deleted:** 16

**Deleted:** 21

**Deleted:** 33

**Deleted:** 34

**Deleted:** 33

**Deleted:** 34

**Deleted:** 64

concession charge "doesn't change what we reported." Goldring Dep. 55:3–6; 59:1–25. Top Line is also "not a hundred percent clear" how the landlord applied Plaintiff's security deposit and other payments. Goldring Dep. 58:14–18.

**D. The Reported Balance Is Disputed in Fact**

45. Top Line reported to TransUnion that Plaintiff owed $3,820 and that the account was 60 days past due. Goldring Dep. 43:22–44:1; ECF No. 47-1 (Pl. Ex. A) (Top Line's internal export of the reporting data, produced under court compulsion, confirms: account number 248299491887, Current Balance "$3,820.90," Account Status "78-Account 60-89 days past the due date" (Metro 2 code 78), Date of Last Payment 5/5/2024, Last Payment Amount $2,575, Date Opened 9/11/2023, Report Month/Year July 2024). Plaintiff paid May 2024 rent and directed 101 Bruckner to apply her security deposit to June 2024 rent before vacating. Silver Dep. 22:1–7.Mallon Decl. Exh G.

46. Plaintiff's financial responsibility under the lease would end when a replacement tenant was found. On January 12, 2024, JCS property manager Joseph Klein e-mailed Plaintiff: "The only way to break the lease[ ] [i]s if you find someone to take over the remaining of your lease." Mallon Decl. Ex. C (Jan. 11–12, 2024 e-mail thread between A. Silver and J. Klein). On May 28, 2024, Mr. Klein e-mailed Plaintiff again: "[E]ven though you have moved out of 101 Bruckner, you are still responsible for the lease until it ends. This includes the obligation to continue paying rent until either the lease term concludes or a new tenant is found to take over the lease." Mallon Decl. Ex. C (May 28, 2024 e-mail from J. Klein). A new tenant, Jhenelle Davis, took over the lease for Apartment 2F effective July 15, 2024. SilverDep.22:1–7. ]Mallon Decl. Ex. C (Aug. 17, 2024 e-mail from A. Silver to

16

J. Klein confirming July 15, 2024 commencement of new tenant's lease). No further rent was charged on the ledger that Top Line itself relied upon after the July 1, 2024 charges, consistent with the apartment having been re-rented as of July 15, 2024. ECF No. 56-8.

47. On June 19, 2024, the rent ledger reflects an entry adding Plaintiff's security deposit to the account. Goldring Dep. 58:6–18; ECF No. 56-8 (rent ledger).

48. The $3,820 figure Top Line reported to TransUnion does not match any of the contemporaneous balance figures that 101 Bruckner Realty or JCS Realty conveyed to Plaintiff or to the state court. Top Line's production includes a June 4, 2024 landlord demand letter for $8,970.90 (DEF0006); a July 3, 2024 landlord demand letter for $10,307.90 (DEF0007); and the December 24, 2024 state-court complaint that 101 Bruckner Realty filed against Plaintiff, which demands $10,357.90 (DEF0001–DEF0003). JCS management separately conveyed an approximate balance of "$2,000-something" in a same-day e-mail. Silver Dep. 22:3–7.

**E. Top Line Reports Approximately 60,000–75,000 Tradelines per Month**

49. Top Line reports approximately 60,000 to 75,000 consumer tradelines to TransUnion and Equifax each month across its landlord-client base. Goldring Dep. 35:18–23; Goldring Decl. ¶ 10.

50. Top Line currently reports for approximately 130–140 landlord clients, each spanning multiple properties and states. Goldring Dep. 11:8–17.

**F. Plaintiff's Damages**

17

| Deleted: 59 |
| Deleted: 12:1–6 |
| Deleted: 36 |
| Deleted: 12 |
| Deleted: 11 |

51.     Plaintiff's credit score dropped from "exceptional" to a score "in the low 600s" as a result of Top Line's reporting. Silver Dep. 45:20–46:3.

52.     Plaintiff applied for, and was denied, an Apple/Goldman Sachs credit card during the relevant period, with attendant loss of tiered cash-back rewards (3% / 2% / 1%) and Apple Cash benefits. Silver Dep. 44:3–47:17; Mallon Decl. Ex. D. (Goldman Sachs Bank USA, Apple Card Adverse Action Notice dated April 7, 2025, sent to aliyahbsilver@icloud.com, denying the application for "Serious delinquency" and "Amount past due on accounts" and identifying TransUnion Consumer Solutions as the source of the credit report; recording Plaintiff's TransUnion-sourced credit score as 631 as of April 7, 2025).

53.     Plaintiff suffered panic anxiety, embarrassment, humiliation, and prolonged stress from disputing the false reporting on her credit. Silver Dep. 43:21-44:23; 45:20–24; 48:12–50:2. That distress persisted for at least nine months and continued through the date of her February 11, 2026 deposition. Silver Dep. 44:16–23; 57:14–58:3.

Dated: New York, New York
        May 27, 2026

/s/ *Kevin Mallon*
Kevin Mallon
550 Kinderkamack Road, Suite 117
Oradell, NJ 07649
(646) 713-1008
kmallon@consumerprotectionfirm.com

*s/ Brian Bromberg*
Brian Bromberg
Bromberg Law Office, P.C.
99 Main St.
Nyack, NY 10960
(212) 248-7906
brian@bromberglawoffice.com

18

Deleted: 5
Deleted: 13

Deleted: 44:18–21;
Deleted: 23
Deleted: 24
Deleted: 49
Deleted: 5
Deleted: 18
Deleted: 21
Deleted: 1